IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

WILLIS DODE EUBANKS                                                                     PLAINTIFF

v.                      Civil No. 10-5005

SGT. RANDY CLARK, Centerton Police Department;
OFFICER RON D. YOUSEY, Centerton Police
Department; SGT. J. VAUGHN, Benton County
Detention Center; NURSE M. SMITH, Benton County
Detention Center; DEPUTY D. LARKIN, Benton County
Detention Center; DETECTIVE CODY HARPER,
Centerton Police Department; DEPUTY JEREMIAH
COTTON, Benton County Detention Center; and
DR. HUSKINS, Benton County Detention Center                 DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Plaintiff, Willis Dode Eubanks (hereinafter Eubanks), filed this civil rights action pursuant to 42 U.S.C. § 1983. He proceeds *pro se* and *in forma pauperis*.

Eubanks is incarcerated in the Benton County Detention Center (BCDC). The events at issue in this case began the morning of September 17, 2009, when the Centerton Police and Fire Department responded to a 911 call. Eubanks maintains the Defendants used excessive force against him during the arrest and failed to render him medical assistance or see that he was provided with medical assistance.

A motion for summary judgment motion (Doc. 48) was filed on behalf of Separate Defendants, the City of Centerton, Arkansas, Sgt. Randy Clark, Det. Cody B. Harper, and Officer Ron D. Yousey. To assist Eubanks in responding to the summary judgment motion, I propounded a questionnaire (Doc. 93). Eubanks has filed his response (Doc. 98). The summary judgment motion

is now ready for decision.

## 1. Background

On September 16, 2009, the evening prior to the arrest involved in this case, Eubanks was arrested on a warrant after a call about a verbal disturbance. Resp. at ¶ 28. He was released the morning of September 17th and returned to his residence Id. at ¶ 29. Curtis Slinkard (Slinkard) and Shayna Ward (Ward) were already inside the residence. Id.

Slinkard completed an affidavit of complaint regarding the events that transpired after Eubanks arrived at the residence on the morning of September 17th.[1] Resp. at ¶ 11. Slinkard indicated he was asleep at 336 Graystone, Centerton, Arkansas, when he woke with Eubanks inside the bedroom throwing items off the television and VCR and grabbing the VCR. Id. at ¶ 12. According to Slinkard, Ward and Slinkard's minor son, Logan, were also in the bedroom. Defts' Ex. 2 at No. 11; Resp. at ¶ 16(A) (to the best of my knowledge no minor child was in the residence).

According to Slinkard, Eubanks rushed him while he was still in bed and started hitting him. Resp. at ¶ 11. Eubanks' right arm was broken when he hit or slammed into the door. Resp. at ¶ 16(C). Eubanks had a knife and stabbed Slinkard in the right thigh. Id. at ¶ 17.

Eubanks went to the Centerpoint Conoco Convenience Store (Centerpoint Store) to call the police and obtain medical assistance. Resp. at ¶ 18. Slinkard also went to the Centerpoint Store. Defts' Ex. 2 at No. 11.

Eubanks was yelling at Slinkard that he would go to jail for attacking Eubanks in his house. Resp. at ¶ 20. Eubanks entered the store and the clerk handed him the phone. Id. at ¶ 21. Eubanks states he informed the clerk that he was forced to stab someone who had broken into his home and

---

[1] Eubanks maintains Slinkard lied repeatedly in the affidavit. See e.g., Resp. at ¶ 11.

attacked him. Id.

At approximately 8:30 a.m. on September 17, 2009, Centerton Police and Fire Departments, as well as the Bentonville Fire Department, responded to what was initially reported as a burglary attempt. Plaintiff's Response (Doc. 98) (hereinafter Resp.) at ¶ 1(A). Officers responded to the Centerpoint Store. Id. at ¶ 1(B).

The Centerton Police and Fire Department personnel who responded to the call were: Police Chief Lance Johnson; Sergeant Randy Clark; Officer Ron Yousey; Detective Cody Harper; Fire Department Chief Jeff Coffelt; and volunteer firemen and medical first responders Robert Coffelt; Randy Gully; and Paul Higginbotham. Defendants' Exhibits 2 at No. 1 (hereinafter Defts' Ex.) & 9 at ¶¶ 4-5; Resp. at ¶ 4(without knowledge to agree or disagree). Chief Johnson served as Chief of Police on September 17, 2009, and continues in that capacity. Defts' Ex. 6 at ¶ 2; Resp. at ¶ 5(without knowledge to agree or disagree). Sergeant Clark, Officer Yousey, and Detective Harper were Centerton police officers on September 17, 2009, and continue in that capacity. Defts' Exs. 4 at ¶ 2; 10 at ¶ 2; and 8 at ¶ 2; Resp. at ¶ 6 (without knowledge to agree or disagree).

While in route, Officers were advised that someone had been stabbed. Resp. at ¶ 2. The stabbing victim was Slinkard. Id.

When Sergeant Clark arrived at the Centerpoint Store, Eubanks was standing next to Slinkard. Resp. at ¶ 22(A). As Sergeant Clark approached, Eubanks stepped away from Slinkard. Id. at ¶ 22(B). By the time Chief Johnson arrived, Chief Coffelt was on the scene and Eubanks was sitting on a bench about ten feet away from Slinkard. Defts' Ex. 2 at No. 11, Affidavit for Probable Cause pg. 2; Resp. at ¶ 22(C)(without knowledge to agree or disagree--unfamiliar with Chief Johnson).

Eubanks was bleeding from his mouth. Resp. at ¶ 22(E). Chief Coffelt was by Slinkard, who

was identified as the victim, assessing the situation.  Defts' Ex. 2 at No. 11, Affidavit for Probable Cause pg. 2.  Chief Johnson took his medical bag and went to assist with Slinkard.  Resp. at ¶ 24.  After more medical personnel arrived, Chief Johnson advised Sergeant Clark to place Eubanks, identified as the suspect, into custody.  Defts' Ex. 2 at No. 11, Affidavit for Probable Cause pg. 2; Resp. at ¶ 25(A)(Sergeant Clark, acting on his own, immediately placed me under arrest and handcuffed me).

Eubanks maintains Sergeant Clark twisted and forced his broken right arm behind his back, then lifted up on his arms with unnecessary force, and handcuffed him behind his back.  Resp. at ¶ 25(B).  Eubanks asserts Sergeant Clark did all this after he told him his right arm was broken.  Id.  Eubanks indicates that he was peacefully submitting to the arrest, obeying Sergeant Clark's orders, complaining about his injuries, and requesting medical treatment.  Id.

When Officer Yousey arrived, Chief Johnson and Sergeant Clark were already at the Centerpoint Store.  Defts' Ex. 2 at No. 11, Affidavit for Probable Cause.  According to Defendants, Eubanks was already handcuffed and sitting on the bench next to the front entrance.  Id.; Resp. at ¶ 31 (Eubanks indicates he was standing and being cuffed when Officer Yousey arrived).

Officer Yousey read Eubanks his *Miranda* rights and began to question him about what happened.  Resp. at ¶ 32.  Officer Yousey was then instructed by Chief Johnson to hold all questions until Eubanks could be questioned in private.  Id.

Eubanks was searched by Officer Yousey and a bloody knife was found in the right front pocket of his pants and taken into evidence.  Resp. at ¶ 27(A).  Eubanks told Officer Yousey that his right arm just above his wrist was hurting from when he got slammed into the door jam of his apartment by Slinkard.  Id. at ¶ 33.  Eubanks indicates he also told Officer Yousey he believed it was

broken and requested medical care. Id.

According to Defendants, first responders checked Eubanks' arm and told him that it was just a deep bruise. Resp. at ¶ 34. Eubanks denies he was told it was just a deep bruise. Id. Additionally, he asserts all the first responders deny making this statement. Id.

Officer Yousey was directed by Chief Johnson to take Eubanks to the BCDC to be booked. Resp. at ¶ 35(A). When Officer Yousey placed Eubanks in the back seat of his patrol car, Eubanks complained that his wrist was hurting and asked to have it looked at again. Id. at ¶ 35(B).

A dash cam video[2] was made by Officer Yousey. Resp. at ¶ 35(C). Eubanks has been allowed to view the video. Id. at ¶ 35(D).

Officer Yousey asked Chief Coffelt to examine Eubanks. Defts' Exs. 2 at No 1, CPD Incidents report pg. 3; Exhibit 5 ¶ 9; Exhibit 10 ¶ 10. Eubanks was removed from the backseat, his handcuffs taken off, and medical first responders/firemen Chief Coffelt, Robert Coffelt, Gully and Higginbotham looked at Eubanks' arm. Defts' Exs. 2 at No. 11; Exhibit 5 at ¶¶ 6-7; Exhibit 7 at ¶ 9; Exhibit 10 at ¶ 10; Exhibit 9 at ¶ 5. Eubanks maintains his arm was looked at for approximately three or four seconds. Resp. at ¶ 35(F). Eubanks also contends a broken bone cannot be diagnosed without an x-ray. Id. at ¶ 35(H). Officer Yousey asserts he never heard the first responders tell Eubanks that his arm was broken or that he needed immediate emergency care provided by an ambulance or hospital. Defts' Ex. 10 at ¶ 10.

Chief Coffelt is a licensed emergency medial service provider (an EMT) with the National Registry of Emergency Medical Technicians, with fourteen years of experience as an EMT. Resp.

---

[2] The dash cam video and an audio recording of Eubanks' interview at the BCDC were submitted to the Court. See Docket Notation dated August 2, 2010. Unfortunately, Eubanks is out of sight of the equipment for the majority of the video.

at ¶ 35(J). According to Chief Coffelt, Officer Yousey, Higginbotham, and Gully, Eubanks' arm was not obviously seriously injured at the time. Defts' Ex. 5 at ¶ 11; Exhibit 7 at ¶ 12; Exhibit 9 at ¶ 6. Defendants maintain the only visible marks at the time were a small amount of swelling and demarcation of the skin which is typical of most handcuffing. Defts' Ex. 5 at ¶ 12. Coffelt, Gully, and Officer Yousey believed Eubanks' injuries were not serious enough to warrant an ambulance being called or a police transport to the hospital. Defts' Ex. 5 at ¶ 11; Exhibit 7 at ¶ 15; and Exhibit 10 at ¶ 13.

Higginbotham noticed no obvious deformity. Defts' Ex. 9 at ¶ 6. There were, however, marks and bruising to the lower arm or wrist. Id.

When Chief Coffelt was called to look at Eubanks' arm again, Eubanks did not say he wanted an ambulance or wanted to be taken to the hospital. Defts' Ex. 5 at ¶ 11; Exhibit 7 at ¶ 15; and Exhibit 10 at ¶ 13. Eubanks indicates he simply did not have time to talk to the first responders because Officer Yousey stated he had to be transported to the BCDC for questioning. Resp. at ¶ 35(N).

Gully is a volunteer for the Centerton Fire Department and a licensed EMT with the National Registry of Emergency Medical Technicians, with sixteen years of experience as an EMT. Defts' Exs. 7 at ¶ 2; Exhibit 2 at No. 11. When he arrived at the scene on September 17, 2009, Gully approached Eubanks where he was sitting on the bench and asked him if he was okay. Resp. at ¶ 36(B). According to Gully, Eubanks responded that he was fine but that his wrists hurt. Defts' Ex. 7 at ¶¶ 5-6. According to Eubanks, he responded that his right arm was hurting and that it was broken. Resp. at ¶ 36(C).

Gully had a CPD officer look at Eubanks' wrists to ensure the handcuffs were not too tight.

Defts' Ex. 7 at ¶ 7; Resp. at ¶ 36(D). The CPD officer told Gully that Eubanks' handcuffs were not too tight. Defts' Ex. 7 at ¶ 7; Resp. at ¶ 36(E)(without knowledge to agree or disagree).

According to Gully, after the officer checked the handcuffs, Gully asked Eubanks if he wanted to go to the hospital. Defts' Ex. 7 at ¶ 9. Gully indicates Eubanks stated he did not want to go to the hospital. Id. Eubanks, however, states he never refused to go to the hospital or refused medical treatment. Resp. at ¶¶ 36(F) & (G). He also notes there is nothing in any written records from the CPD or the fire departments that indicate he did not want to go to the hospital or refused medical treatment. Id. at ¶ 36(G).

Higginbotham is a volunteer for the Centerton Fire Department and a licensed EMT with the National Registry of Emergency Medical Technicians with seven years of experience as an EMT. Resp. at ¶ 37(A). Higginbotham was one of the EMT's who examined Eubanks' wrists as he stood outside Officer Yousey's patrol car. Defts' Ex. 9 at ¶ 2; Resp. at ¶ 37(B). According to Higginbotham, Eubanks was angry and wanted to know if he could avoid jail by going to the hospital. Defts' Ex. 9 at ¶¶ 8-9. Higginbotham indicates he told Eubanks that he was going to jail regardless. Id. Higginbotham states Eubanks then said he did not want to go to the hospital. Id.

Again, Eubanks maintains there is no mention in any of the written reports about the incident of his being angry and wanting to know if he could avoid jail by going to the hospital. Resp. at ¶¶ 37 (C) & (D). Instead, he states he repeatedly asked for treatment for his injuries. Id. at ¶ 37 (D).

Eubanks was taken to the BCDC at approximately 9:11 a.m. on September 17th. Resp. at ¶ 38. According to Officer Yousey, he asked the booking officer to have the jail nurse look at Eubanks' arm. Defts' Ex. 2 at No. 11, Affidavit for Probable Cause. Officer Yousey indicates he was advised the jail nurse would check with Eubanks within a few minutes. Id.

Eubanks states he informed the booking jailer about his injuries and requested transport to the hospital. Resp. at ¶ 39. When his request was denied, Eubanks indicates he asked to see the jail doctor or nurse. Id.

The jail nurse's notes indicates she examined Eubanks in the booking area. Resp. Exhibit 1 at pg. 10. She noted Eubanks' right arm had a "slight knot above wrist, fingers slightly swollen at this time." Id. While Eubanks reported being unable to move his fingers, the nurse stated with help he was able to bend his fingers. Id.

A medical questionnaire was completed as part of the booking process. Resp. at ¶ 41. The questionnaire indicates Eubanks' right arm was hurting and his mouth bleeding. Id. Eubanks asserts he told the officer his arm was broken. Id. When asked how he knew this, Eubanks states he responded it was hurting "real bad" and he was unable to move it in some positions. Id.

Eubanks was interviewed by Detective Harper at the BCDC on September 17th at approximately 10:26 a.m. Resp. at ¶ 46(A). During the interview, Eubanks showed Detective Harper a small cut on the left side of his upper lip and stated he believed his arm was not broken all the way just fractured. Id. The interview with Detective Harper was audio taped. Resp. at ¶ 47(B). Eubanks was provided with a copy of the audio tape. During the interview, Eubanks discussed his injuries and indicate he wanted an x-ray taken. Resp. at ¶ 47(C). Additionally, Eubanks maintains that on the way to the interview room he asked to be transported to the hospital immediately. Id. In response, Eubanks indicates Detective Harper said that if Eubanks just gave him a recorded statement and answered all of his questions that Detective Harper would see to it that Eubanks received medical treatment for his injuries. Id.

During the interview, Eubanks told Detective Harper the jail nurse had looked at his arm but

did not say anything about it.  Resp. at ¶ 47(D).  Eubanks stated his arm was not getting any better and he would like to have it x-rayed.  Id. at ¶ 47(E).  Towards the end of the interview, Eubanks asked for assistance with getting his personal property from his residence.  Id. at ¶ 47(G).

Eubanks maintains Detective Harper used excessive force against him before, during, and after the recorded interview.  Resp. at ¶ 46(B).  When asked to describe the amount of force used, Eubanks responded: "refusing to help me receive medical assistance and/or x-rays of my broken arm after my repeated requests for assistance."  Id.

Eubanks was taken to Mercy Medical Center on September 21st.  Resp. at ¶ 43.  It was determined that he had a closed fracture of the shaft of his right ulna.  Id. A splint was provided and Eubanks instructed to see an orthopaedic doctor.  Id. at ¶ 44.  Eubanks was also prescribed medication.  Id.  Eubanks was seen by an orthopaedic doctor on September 30th.  Defts' Ex. 2 (clinic note dated September 30, 2009).  Ultimately, he was treated with a long arm cast.  Ozark Orthopaedic Medical Records Produced Pursuant to Court Subpoena (Doc. 34)

The Centerton Police Department (CPD's) Policy and Procedures Manual contains an arrest policy which prohibits the use of excessive force.  Defts' Ex. 2 at No. 9.  Section 5.1(b)(3)(a) of the CPD's Policy and Procedures Manual states "only the force necessary to effectively make an arrest will be used."  Defts' Ex. 2 at No. 9 § 5.  With respect to injured persons, section 42.1(a) of the CPD's Policy and Procedures Manual states:  "Persons who are taken into custody with visible injuries or convincing complaints of an injury shall be provided with professional medical care prior to incarceration."  Defts' Ex. 2 at No. 9 § 42.  These policies and procedures were in effect on September 17, 2009.  Defts' Ex. 2 at No. 9.

Eubanks agrees that the CPD's Policies and Procedures Manual contains these provisions.

Resp. at ¶¶ 7-10. However, he maintains the CPD's practice is to hand-cuff all suspects under arrest without consideration of, or exception for, their injuries. Id. at ¶ 7. He also maintains Officer Yousey and Sergeant Clark broke or violated these provisions. With respect to Sergeant Clark, Eubanks contends Sergeant Clark twisted his broken arm behind his back, lifted up on it with unnecessary force and hand-cuffed his hands behind his back after Eubanks had stated his arm was broken and he needed medical treatment. Id. at ¶ 8. He also maintains Officer Yousey violated these provisions when he re-handcuffed him after Eubanks repeatedly stated he had a broken arm and needed medical care. Id. Eubanks emphasizes that he was not resisting in anyway or being combative. Id. Despite this, Eubanks states Sergeant Clark and Officer Yousey refused to have him transported by ambulance to the hospital for treatment or to obtain any medical treatment for him. Id. at ¶ 9. Eubanks also maintains Detective Harper did not follow § 42.1(a) when he failed to assist Eubanks medical assistance after Eubanks reported his injuries and requested x-rays and medical treatment. Resp. at ¶ 9.

### 2. Applicable Standard

"Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We view all evidence and inferences in a light most favorable to the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). However, the nonmoving party may not rest upon mere denials or allegations in the pleadings and must set forth specific facts to raise a genuine issue for trial. See Celotex v. Catrett, 477 U.S. 317, 324 (1986).

### 3. Arguments of the Parties

First, Defendants argue they have been sued in their official capacities only. As there is no

evidence that a policy or custom of the City was the moving force behind any alleged constitutional violation, they maintain they are entitled to judgment in their favor. Second, Defendants argue that any force used was reasonable and necessary under the circumstances. Finally, Defendants argue there is no proof that any City official acted with deliberate indifference to a known, serious medical need either before or after Eubanks' arrest.

Eubanks first maintains that he has sued the Defendants in both their individual and official capacities. To the extent he has not made this entirely clear, he points out he has filed a motion to amend his complaint to explicitly state he is suing the Defendants in both capacities. Eubanks next argues that Sergeant Clark and Officer Yousey used excessive force against him when he was handcuffed despite his having told them that he had a broken arm and needed medical attention. Finally, he maintains Sergeant Clark, Officer Yousey, and Detective Harper exhibited deliberate indifference to his serious medical needs when he was not given treatment at the scene, transported to the hospital, treated prior to his incarceration, or offered treatment at the time he was interviewed by Detective Harper.

### 4. Discussion

I will address the arguments in turn.

### (A). Official versus Individual Capacity Claims

Section 1983 provides a federal cause of action for the deprivation, under color of law, of a citizen's "rights, privileges, or immunities secured by the Constitution and laws" of the United States. In order to state a claim under 42 U.S.C. § 1983, plaintiff must allege that the defendant acted under color of state law and that he violated a right secured by the Constitution. West v. Atkins, 487 U.S. 42 (1988); Dunham v. Wadley, 195 F.3d 1007, 1009 (8th Cir.1999). The deprivation must be

intentional; mere negligence will not suffice to state a claim for deprivation of a constitutional right under § 1983. Daniels v. Williams, 474 U.S. 327 (1986); Davidson v. Cannon, 474 U.S. 344 (1986).

Under § 1983, a defendant may be sued in either his individual capacity, or in his official capacity, or claims may be stated against a defendant in both his individual and his official capacities. In Gorman v. Bartch, 152 F.3d 907 (8th Cir. 1998), the Eighth Circuit discussed the distinction between individual and official capacity suits. As explained by the *Gorman* case:

> Claims against government actors in their individual capacities differ from those in their official capacities as to the type of conduct that is actionable and as to the type of defense that is available. *See Hafer v. Melo*, 502 U.S. 21, 112 S. Ct. 358, 116 L. Ed. 2d 301 (1991). Claims against individuals in their official capacities are equivalent to claims against the entity for which they work; they require proof that a policy or custom of the entity violated the plaintiff's rights, and the only type of immunity available is one belonging to the entity itself. *Id.* 502 U.S. at 24-27, 112 S. Ct. at 361-62 (1991). Personal capacity claims, on the other hand, are those which allege personal liability for individual actions by officials in the course of their duties; these claims do not require proof of any policy and qualified immunity may be raised as a defense. *Id.* 502 U.S. at 25-27, 112 S. Ct. at 362.

Gorman, 152 F.3d at 914.

The Eighth Circuit has consistently advised plaintiffs to specifically plead whether government agents are being sued in their official or individual capacities to ensure prompt notice of potential personal liability. Nix v. Norman, 879 F.2d 429, 431 (8th Cir. 1989); see also Andrus v. Arkansas, 197 F.3d 953 (8th Cir. 1999)(In actions against officers, specific pleading of individual capacity is required to put public officials on notice they will be exposed to personal liability).

In this case, Eubanks is proceeding *pro se*. He has noted that the complaint form provided to him at the time he filed this case did not contain a place to indicate the capacity in which he was suing the Defendants. Resp. at ¶ 50(A). He also maintains the wording of the complaint was such that Defendants should have been on notice they were also being sued in their individual capacities.

Id. Finally, he points out that he has filed a motion to amend his complaint to clearly state he is suing the Defendants in both capacities. Id.

I believe the complaint should be construed as asserting both individual and official capacity claims. As Eubanks points out, as soon as he was made aware of Defendants' argument, he filed a motion to amend the complaint to explicitly state he was suing Defendants in both capacities. By separate order, Eubanks' motion to amend his complaint (Doc. 89) will be granted.

With respect to the Defendants' argument that there is no evidence of a custom, policy, or practice on their part, I disagree. Under Monell v. Dep't of Soc. Servs. of New York, 436 U.S. 658, 690 (1978), the City of Centerton may be held liable under § 1983 if one of its customs or policies caused the violation of Eubanks' rights. Here, Eubanks maintains the custom or practice of the City is to handcuff individuals being arrested without regard for any injuries they may have.

### (B). Excessive Force

"All claims that law enforcement officers have used excessive force in the course of an arrest or investigatory stop of a free citizen should be analyzed under the reasonableness standard of the Fourth Amendment." Winters v. Adams, 254 F.3d 758, 764 (8th Cir. 2001)(citation omitted); see also Henderson v. Munn, 439 F.3d 497, 502 (8th Cir. 2006). "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake." Graham v. Connor, 490 U.S. 386, 396 (1989)(internal quotations omitted). "[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Id.

The Eighth Circuit has held that "allegations of pain as a result of being handcuffed, without some evidence of more permanent injury, are [not] sufficient to support [a] claim of excessive force."

Foster v. Metro. Airports Comm'n, 914 F.2d 1076, 1082 (8th Cir. 1990); see also Wertish v. Krueger, 433 F.3d 1062, 1067 (8th Cir. 2006)(relatively minor scrapes and bruises coupled with a less-than-permanent aggravation of a prior shoulder condition were *de minimis* injuries that did not support an excessive force case).  The knowledge of the officer, however, is a factor to be taken into account. Cavataio v. City of Bella Vista, 570 F.3d 1015,1020 (8th Cir. 2009).  "[C]ases indicate that an officer may not knowingly use handcuffs in a way that will inflict unnecessary pain or injury on an individual who presents little or no risk of flight or threat of injury."  Stainback v. Dixon, 569 F.3d 767, 772 (7th Cir. 2009).

In this case, I believe there are genuine issues of fact that preclude summary judgment in Defendants' favor on this claim.  Eubanks maintains he repeatedly told the officers that his arm was hurting or broken, he was in pain, and he was in need of medical attention.  Although he was examined by the first responders, Eubanks maintains the "examination" only lasted a few seconds and no treatment was given.  While the act of handcuffing itself normally does not cause injury or pain, in this case the officers were aware of Eubanks' claims of pain and/or a broken arm.  Eubanks continued to complain of pain after he was handcuffed.  "[A]n officer's otherwise reasonable conduct may be objectively unreasonable when the officer knows of an arrestee's medical problems." Stainback, 569 F.3d at 772.

### (C).  Denial of Adequate Medical Care

The Eighth Circuit analyzes both a pretrial detainee's and a convicted inmate's claim of inadequate medical care under the deliberate indifference standard.  See Butler v. Fletcher, 465 F.3d 340, 344 (8th Cir. 2006).  To prevail on an Eighth Amendment claim, Eubanks must prove that Defendants acted with deliberate indifference to his serious medical needs.  Estelle v. Gamble, 429 U.S. 97, 106 (1976). The deliberate indifference standard includes "both an objective and a subjective

component:  'The [Plaintiff] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the [officers] actually knew of but deliberately disregarded those needs.'" Jolly v. Knudsen, 205 F.3d 1094, 1096 (8th Cir. 2000)(quoting Dulany v. Carnahan, 132 F.3d 1234, 1239 (8th Cir.1997)).

"For a claim of deliberate indifference, the prisoner must show more than negligence, more even that gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation.  Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." Popoalii v. Correctional Medical Services, 512 F.3d 488, 499 (8th Cir. 2008)(internal quotation marks and citations omitted).

In this case, Eubanks maintains he should have received medical care at the scene of the arrest, prior to being booked into the BCDC, or when he was interviewed by Detective Harper.  He concedes first responders were at the scene of the arrest and that he was seen by the jail nurse while being booked into the BCDC.

On the record before me, I believe there is an issue of fact as to whether Defendants were deliberately indifferent to Eubanks' serious medical needs.  First, Eubanks was examined only in a cursorily fashion at the scene.  Second, Defendants refused all Eubanks' requests for medical care despite his repeated claims that he was in pain and believed his arm was broken.  Third, according to Eubanks, Defendants handcuffed Eubanks in an extremely painful manner ignoring his medical condition.  I believe it is appropriate to consider this both on the issue of whether excessive force was used and on the issue of whether deliberate indifference to Eubanks' serious medical needs was exhibited.  Finally, when he was interviewed by Detective Harper, Eubanks complained about the pain he was in, indicated he believed his arm was fractured and x-rays were needed, and stated he had received no treatment from the jail nurse.

### 5.  Conclusion

For the reasons stated, I recommend the motion for summary judgment (Doc. 48) be denied.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 9th day of March 2011.

/s/ *Erin L. Setser*
   HON. ERIN L. SETSER
   UNITED STATES MAGISTRATE JUDGE